# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA and State of Texas and Louisiana, *ex rel.*, DOUGLAS JOHNSON,<br><br>Plaintiffs,<br><br>v.<br><br>POST ACUTE MEDICAL, LLC,  et al.,<br><br>Defendants. | CIVIL NO. 17-cv-1269<br>(Jones, J.)<br><br>(Transferred from U.S.D.C., Southern District of Texas, Houston Division (CA No. 12-2920 |

## REDACTED FALSE CLAIMS ACT COMPLAINT OF THE UNITED STATES OF AMERICA AND THE STATES OF TEXAS AND LOUISIANA, *ex rel*. DOUGLAS L. JOHNSON

United States Courts
Southern District of Texas
FILED

SEP 2 7 2012

David J. Bradley, Clerk of Court

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SEALED A, | § | Civil Action No. |
| Plaintiffs | § | _____ 12 - 2920 |
| | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| SEALED B, C, D, E, F, G, H, I, J, and K, | § | **FILED _IN CAMERA_** |
| | § | **AND UNDER SEAL** |
| Defendants. | § | |
| | § | **Pursuant to** |
| | § | **31 USC §3730(b)(2)** |
| | § | |
| | § | **Demand for a Jury Trial** |

# FILED UNDER SEAL


# (ATTENTION SEAL CLERK)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | § | Civil Action No. |
| STATES OF TEXAS and LOUISIANA, | § | |
| *ex rel.* | § | _____ |
| | § | |
| DOUGLAS L. JOHNSON, | § | |
| **Plaintiffs** | § | |
| | § | |
| v. | § | |
| | § | |
| POST ACUTE MEDICAL, LLC; POST | § | **FILED *IN CAMERA*** |
| ACUTE MEDICAL AT LULING, LLC; | § | **AND UNDER SEAL** |
| POST ACUTE MEDICAL AT SAN | § | |
| ANTONIO, LLC; POST ACUTE | § | **Pursuant to** |
| MEDICAL AT VICTORIA, LLC; POST | § | **31 USC §3730(b)(2)** |
| ACUTE MEDICAL OF NEW | § | |
| BRAUNFELS, LLC; POST ACUTE | § | |
| MEDICAL HOLDINGS FOR NEW | § | |
| BRAUNFELS, LLC; POST ACUTE | § | |
| MEDICAL LTACH OF SAN ANTONIO, | § | |
| LLC; POST ACUTE MEDICAL | § | |
| MANAGEMENT, LLC; POST ACUTE | § | |
| MEDICAL OUTPATIENT CLINICS, LLC; | § | |
| and CRESTWOOD HOLDINGS, L.L.C., | § | |
| **Defendants** | § | **Demand for a Jury Trial** |

FALSE CLAIMS ACT COMPLAINT
OF THE UNITED STATES OF AMERICA AND THE STATES OF TEXAS AND
LOUISIANA, *ex rel.* DOUGLAS L. JOHNSON

I.
INTRODUCTION

1.     Relator Douglas L. Johnson ("Relator") brings this action on behalf of the United

States of America ("U.S." or "federal government") and the States of Texas and Louisiana

("Texas," "Louisiana," and jointly, the "States"), and on his own behalf (the U.S., Louisiana, and

Texas may be referred to jointly as the "government" and the U.S., Louisiana, Texas, and Relator

may be referred to collectively as "Plaintiffs"), against Defendants, Post Acute Medical, LLC;

Post Acute Medical at Luling, LLC; Post Acute Medical at San Antonio, LLC; Post Acute Medical at Victoria, LLC;  Post Acute Medical of New Braunfels, LLC; Post Acute Medical Holdings for New Braunfels, LLC; Post Acute Medical LTACH of San Antonio, LLC; Post Acute Medical Management, LLC; Post Acute Medical Outpatient Clinics, LLC; and Crestwood Holdings, L.L.C., f/k/a Northshore Specialty Hospital, L.L.C. (collectively, "Defendants").

2.     Defendants own and/or operate the following Long Term Acute Care ("LTAC") hospitals, rehabilitation hospitals, and clinics: Warm Springs Specialty Hospital of Luling, Warm Springs Specialty Hospital of Victoria, Warm Springs Specialty Hospital of New Braunfels, Northshore Specialty Hospital, Warm Springs Rehabilitation Hospital of San Antonio, Warm Springs Rehabilitation Hospital of Thousand Oaks, Warm Springs Rehabilitation Hospital of Westover Hills, Warm Springs Rehabilitation Center – Lockhart, Warm Springs North Central Clinic, Connally Memorial Rehabilitation Center, and the Frio Rehabilitation Center (collectively, "Hospitals").

3.     Plaintiffs seek treble damages, civil penalties, and other relief arising from Defendants' false claims made in violation of 31 U.S.C. §§3729 *et seq.* (the "federal False Claims Act" or the "FCA"), Defendants' unlawful acts made in violation of the Texas Medicaid Fraud Prevention Act, Texas Human Resource Code §§36.001 *et seq.* (the "Texas Medicaid Fraud Prevention Act" or "TMFPA."), and Defendants' unlawful acts made in violation of the Louisiana False Claims Act, La. Rev. Stat. Ann. §§46:439.1 *et seq.* ( the "Louisiana False Claims Act" or "LFCA").

4.     In addition, in his individual capacity, Relator brings an action against Defendants for retaliation and wrongful termination of employment pursuant to §3730(h) of the FCA and §36.115 of the TMFPA, and under the legal authority established in *Sabine Pilot, Inc. v. Hauck,*

- 2 -

687 S.W.2d 133 (Tex.1985), which creates an exception to the "at-will" employment doctrine in Texas (the "*Sabine Pilot* doctrine of Texas law.")

5.      As a result of employment by Defendants and more than twenty five years of experience in managing healthcare facilities, Relator has direct and independent knowledge that Defendants have committed fraud against the federal and state governments by submitting false claims and committing other unlawful acts with respect to the Medicaid, Medicare, Tricare/Champus, and other federal government healthcare programs (sometimes collectively referred to herein as "government healthcare programs").

6.      The violations of the FCA, TMFPA, and LFCA at issue result from the Defendants' submission of false claims to and other unlawful acts against the Texas and Louisiana Medicaid programs (paid with both state and federal funds), the federal Medicare and Tricare/Champus programs, and other government healthcare programs (paid with federal funds), based upon Defendants' fraud, false statements, false reports and false certifications to Texas, Louisiana, and the U.S.

7.      As described more specifically below, Relator discovered in the course of his employment that Defendants and their Hospitals are paying doctors for services not actually rendered and providing other remuneration intended to induce or reward referrals, in violation of the Anti-Kickback Statute, and in violation of the Stark Law.  Defendants have wrongfully certified that they have complied with the Anti-Kickback Statute and Stark Law, thereby making all the claims they submitted to government healthcare programs false.

8.      On September 11 and 20, 2012, Relator served a Disclosure Statement and exhibits containing all information in his possession regarding the facts alleged in this pleading on the Attorney General of the United States; the U.S. Attorney for the Southern District,

Assistant U.S. Attorney Andrew Bobb; on the Texas Attorney General and Texas Assistant Attorney General Susan Miller; and on the Louisiana Attorney General and Louisiana Assistant Attorney General Fred Duhy.

## II.
## PARTIES

**A.**   **Plaintiffs**

9.     The United States and the States of Texas and Louisiana are the Plaintiffs on behalf of which the Relator brings this action pursuant to the FCA, 31 U.S.C. §§3730 *et seq.,* the TMFPA §§36.101 *et seq.,* and the LFCA §§46:439.1 *et seq.*

10.     Relator Douglas L. Johnson is a United States citizen residing in Carriere, Mississippi. Relator is a highly experienced and successful hospital administrator. He received his Bachelor of Science in Business Administration from Virginia Polytechnic Institute and State University in 1977 and his Masters in Health Administration in 1985 from Virginia Commonwealth University. He has worked in healthcare administration since 1985 and is a board certified Fellow of the American College of Healthcare Executives. Since 1985, Relator has held a number of executive positions with hospitals. He was hired by Defendants in May of 2011 as the Chief Executive Officer of Northshore Specialty Hospital in Covington, Louisiana. Defendants transferred him to Warm Springs Specialty Hospital of Luling as of October 24, 2011, where he served as the Chief Executive Officer and Administrator of that Hospital. On May 23, 2012, he was abruptly placed on administrative leave, and then was terminated as of May 25, 2012.

11.     In the course of his employment as the Chief Executive Officer for Warm Springs Specialty Hospital of Luling, Relator discovered the fraudulent and illegal schemes discussed herein, expressed concern about them to his superiors in Defendants' management on multiple

- 4 -

occasions, and refused to participate in the fraud.  Defendants did not take action to change the fraudulent practices, and instead terminated Relator in retaliation for his actions in raising the issues and refusing to participate in the fraud.  Relator subsequently made disclosure of these schemes to the United States and to the States of Texas and Louisiana, and filed this action.

**B.**      **Defendants**

12.      Defendant Post Acute Medical, LLC (the "Parent Defendant") is a Delaware Limited Liability Corporation.  The Parent Defendant and its affiliates (the other Defendants herein), operate eleven outpatient locations, long term acute care, or rehabilitation Hospitals, providing inpatient care and/or outpatient rehabilitation in Texas and Louisiana.  The principal office of Post Acute Medical, LLC is located at 3500 Market Street, Suite 202, in Camp Hill, Pennsylvania.

13.      Based upon his personal knowledge through employment with Warm Springs Specialty Hospital of Luling and through searches of incorporation documents, Relator believes he has determined which legal entities operate which Hospitals.  However, given the intertwined nature of the companies as evidenced by their shared corporate officers and structure, all Defendants are engaged in the same scheme to defraud the government and other payors.

14.      The eleven long term acute care or rehabilitation Hospitals are:

**Outpatient & Inpatient Locations**
Warm Springs Rehabilitation Hospital of San Antonio
5101 Medical Drive
San Antonio, TX 78229

Warm Springs Specialty Hospital of Victoria a/k/a Victoria Warm Springs Hospital
102 Medical Drive
Victoria, TX 77904

Warm Springs Specialty Hospital of Luling
200 Memorial Drive
Luling, TX 78648

Warm Springs Rehabilitation Hospital of Westover Hills
10323 State Highway 151
San Antonio, Texas 78251

**Outpatient Locations**
Warm Springs Rehabilitation Center Northwest
7616 Culebra #115
San Antonio, TX 78251

Warm Springs Rehabilitation Center Lockhart
300 Commerce, Suite C
Lockhart, TX 78644

Frio Rehabilitation Center
205 Hackberry Street
Pearsall, TX 78061

Connally Memorial Rehabilitation Center
497 10th Street Suite 201
Floresville, TX 78114

**Inpatient Locations**
Northshore Specialty Hospital
20050 Crestwood Boulevard
Covington, Louisiana 70433

Warm Springs Rehabilitation Hospital of Thousand Oaks
14747 Jones Maltsberger Road
San Antonio, Texas 78247

Warm Springs Specialty Hospital of New Braunfels
Hospital of New Braunfels
1445 Hanz Drive
New Braunfels, TX 78130

15.    Defendant Post Acute Medical at Luling, LLC is also a Delaware Limited

Liability Corporation.  Together with the Parent Defendant, it operates

a.    Warm Springs Specialty Hospital of Luling, located at 200 Memorial

Drive, in Luling, Texas, which provides both inpatient care and outpatient

rehabilitation.

16.     Defendant Post Acute Medical at San Antonio, LLC is also a Delaware Limited Liability Corporation.  Together with the Parent Defendant and Defendant Post Acute Medical LTACH of San Antonio, LLC, also a Delaware Limited Liability Corporation, it operates:

 **a.** Warm Springs Rehabilitation Hospital of San Antonio, located at 5101 Medical Drive, San Antonio, Texas, which provides both inpatient care and outpatient rehabilitation;

 **b.** Warm Springs Rehabilitation Hospital of Thousand Oaks, located at 14747 Jones Maltsberger Road, in San Antonio, Texas, which provides inpatient care; and

 **c.** Warm Springs Rehabilitation Hospital of Westover Hills, located at 10323 State Highway 151, in San Antonio, Texas, which provides both inpatient care and outpatient rehabilitation.

17.     Defendant Post Acute Medical at Victoria, LLC is also a Delaware Limited Liability Corporation. Together with the Parent Defendant, it operates

 **a.** Warm Springs Specialty Hospital of Victoria, also known as Victoria Warm Springs Hospital, located at 102 Medical Drive, in Victoria, Texas, which provides both inpatient care and outpatient rehabilitation.

18.     Defendant Post Acute Medical of New Braunfels, LLC is also a Delaware Limited Liability Corporation.  Together with the Parent Defendant, and Defendant Post Acute Medical Holdings for New Braunfels, LLC, it operates

 **a.** Warm Springs Specialty Hospital of New Braunfels, located at 1445 Hanz Drive, in New Braunfels, Texas, which provides inpatient care.

19.   Defendant Post Acute Medical Holdings for New Braunfels, LLC is also a Delaware Limited Liability Corporation.  Together with the Parent Defendant, and Defendant Post Acute Medical of New Braunfels, LLC, it operates:

   a.   Warm Springs Specialty Hospital of New Braunfels, located at 1445 Hanz Drive, in New Braunfels, Texas, which provides inpatient care.

20.   Defendant Post Acute Medical Outpatient Clinics, LLC is also Delaware Limited Liability Corporation.  Together with the Parent Defendant, it operates the following outpatient rehabilitation facilities:

   a.   Warm Springs Rehabilitation Center – Lockhart, located at 300 Commerce, Suite C, in Lockhart, Texas;

   b.   Warm Springs North Central Clinic, also known as Warm Springs Rehabilitation Center Northwest, located at 7616 Culebra #115, in San Antonio, Texas;

   c.   Connally Memorial Rehabilitation Center, located at 497 10th Street, Suite 201, in Floresville, Texas; and

   d.   the Frio Rehabilitation Center, located at 205 Hackberry Street, in Pearsall, Texas.

21.   Defendant Crestwood Holdings, L.L.C. is a Louisiana Limited Liability Company formerly known as Northshore Specialty Hospital, L.L.C., and it operates:

   a.   Northshore Specialty Hospital, in Covington, Louisiana.

22.   Defendant Post Acute Medical Management, LLC is also a Delaware Limited Liability Corporation.  All of its Officers are the same as for Post Acute Medical, LLC, the Parent Defendant.  Together with the Parent Defendant, it operates all eleven Hospitals.

- 8 -

23.     Defendant Warm Springs Hospital System, which was sold to Parent Defendant in 2006, advertises on its webpage, www.warmsprings.org/about/, that "Post Acute Medical and it's [sic] subsidiaries Warm Springs Hospital System and Northshore Specialty Hospital, are committed to providing high quality patient care and outstanding customer service, coupled with loyalty and dedication of highly trained staff, to be the most trusted source for post-acute services in every community it serves."

24.     According to the information of which Relator has knowledge, the "loyalty and dedication of highly trained staff" results, at least in part, from the kickbacks provided by Defendants to physicians in each location, in violation of the AKS, Stark Law, FCA, TMFPA, and/or LFCA.

### III.
### RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

25.     When the Defendants herein are collectively referred to as the "Defendants", the allegations contained in that sentence and paragraph are alleged severally against each separate Defendant.

26.     The Defendants are all related entities, in that Defendants are entities the operations of which are inextricably intertwined and which were acting in concert together to foster, facilitate and promote the false, fraudulent and unlawful conduct alleged herein. As such, each of the Defendants is jointly and severally liable for the actions of each Defendant. It is alleged that employees and officers of all the Defendants acted in harmony and concert to commit the unlawful acts specified in this Amended Complaint.

27.     The Defendants are related entities sharing common elements of management, finances, control, supervision, and reporting and thus are mutually, jointly, and severally liable under legal theories of *respondeat superior*, and the past, present and continuing relations and

dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them should be considered as a single business entity, and/or a joint enterprise in pursuing the scheme made the basis of this suit.

## III.
## JURISDICTION

28.     This action arises under the FCA, 31 U.S.C. §§3729 et seq., and the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1345.

29.     This Court also has supplemental jurisdiction over the claims brought by Relator on behalf herself and on behalf of the States under the State FCAs, pursuant to 28 U.S.C. §1367(a) and 31 U.S.C. §3732(b).

## IV.
## VENUE

30.     Venue in this district is proper pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b) and (c) since one or more of the Defendants transact business in this district and/or one or more of the acts at issue occurred in this district.

## V.
## OVERVIEW OF GOVERNMENT HEALTHCARE PROGRAMS

### A.     Medicare

31.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Health Insurance for the Aged and Disabled Program or the Medicare Program ("Medicare"), to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426A. The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of Medicare, which is funded with taxpayer revenue. The Centers for Medicare

and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

32.     Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home healthcare.  See 42 U.S.C. §§ 1395c-1395i-4.  Part B of the Medicare Program covers payment for physician services and certain outpatient services that Part A does not cover.  The inpatient services provided by Defendants at their Hospitals are covered by Part A.  The outpatient services provided by Defendants at their facilities are covered by Part B.

33.     CMS contracts with private entities known as carriers to process claims and carry out other administrative functions for Medicare Part A.  The carrier responsible for Part A in Texas is TrailBlazer Health Enterprises, LLC.  The carrier responsible for Part A in Louisiana is Pinnacle Business Solutions Inc.  CMS makes payments to Medicare-eligible providers for services they provide to Medicare-eligible patients after the services are rendered.  Medicare enters into provider agreements with providers such as Defendants in order to establish the providers' eligibility to participate in the Medicare Program.  Medicare does not prospectively contract with providers to provide particular services for particular patients.

**B.     Medicaid**

34.     The Medicaid program is a health insurance program for qualified beneficiaries funded by federal and state taxpayer revenues enacted pursuant to Title XIX of the Social Security Act. 42 U.S.C. §§ 1396-1396v.  Each state is permitted to design its own medical assistance plan. 42 U.S.C. § 1396a.

35.     The Texas Health and Human Services Commission (HHSC) administers the Texas Medicaid program.  Texas Medicaid & Health Partnership (TMHP) serves as the fiscal

agent for the Texas Medicaid program. TMHP periodically issues a Texas Medicaid Provider

Application, which includes the HHSC Medicaid Provider Agreement ("Medicaid Provider

Agreement").

36.     The Medicaid Provider Agreement for Texas requires that, as a condition for

participation in the Texas Medicaid program, a provider must agree to comply with all terms and

conditions of the Provider Agreement, including but not limited to:

> 1.2.3      This Agreement is subject to all state and federal laws and
> regulations relating to fraud, abuse and waste in health care and the Medicaid
> program.
>
> 1.3.1      Provider agrees to submit claims for payment in accordance
> with billing guidelines and procedures promulgated by HHSC, or other
> appropriate payor, including electronic claims. Provider certifies that information
> submitted regarding claims or encounter data will be true, accurate, and complete,
> and that the Provider's records and documents are both accessible and validate the
> services and the need for services billed and represented as provided.  Further,
> ***Provider understands that any falsification or concealment of a material fact
> may be prosecuted under state and federal laws. . . .***

(Texas Medicaid Provider Agreement, p. 6.2; emphasis added.).

37.     The Louisiana Bureau of Health Services Financing (BHSF) administers the

Louisiana Medicaid Program.     Molina Medicaid Solutions manages administrative

responsibilities for the Provider Enrollment Unit.  Molina Medicaid Solutions includes in its

Provider Enrollment packet a Medicaid Provider Agreement.

38.     The Medicaid Provider Agreement for Louisiana requires that, as a condition for

participation in the Louisiana Medicaid program, a provider must agree to comply with all terms

and conditions of the Provider Agreement, including but not limited to:

> 17. I agree to adhere to the published regulations of the DHH Secretary
> and the Bureau of Health Services Financing, including, but not limited to, those
> rules regarding recoupment and disclosure requirements as specified in 42 CFR
> 455, Subpart B;

18. I agree to adhere to the federal Health Insurance Portability and Accountability Act (HIPAA) and all applicable HIPAA regulations issued by the federal Department of Health and Human Services, including, but not limited to, the requirements and obligations imposed by those regulations regarding the conduct of electronic health care transactions and the protection of the privacy and security of individual health information and any additional regulatory requirements imposed under HIPAA;

****

22. I certify that all claims provided to Louisiana Medicaid recipients will be necessary, medically needed and will be rendered by me or under my personal supervision;

23. I understand that all claims submitted to Louisiana Medicaid will be paid and satisfied from federal and state funds, and *that any falsification or concealment of a material fact, may be prosecuted under Federal and State laws*; ...

(Louisiana PE-50 Addendum – Provider Agreement, p. 1-2; emphasis added.).

## C.     Tricare/Champus

39.     At all times relevant to this Complaint, Defendants and many of Defendants' patients were enrolled in, and sought reimbursement from, the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), now known as Tricare ("Tricare/Champus").

40.     Tricare/Champus is a federal taxpayer-funded program that provides medical benefits to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceased service members; and (c) retirees.  Services at non-military facilities are sometimes provided for active duty members of the armed forces, as well.  10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

41.     Humana Military Health Services (Humana) administers the Tricare/Champus program for the Tricare South Region, which includes Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, Oklahoma, South Carolina, Tennessee, Texas (excluding the El Paso area), and Fort Campbell, Kentucky.  Humana requires providers to sign a Participation

Agreement as a condition of participation in Tricare/Champus. Among other things, the agreement mandates a provider "[t]o comply with applicable provisions of 32 CFR 199 and related Tricare policy . . ." (Humana Participation Agreement at p. 3, item 2.)

**D.     Other Government Healthcare Programs**

42.     The Federal Employees Health Benefits Program ("FEHBP") provides healthcare benefits for qualified federal employees and their dependents. It pays for various services, including those at issue here. Other government healthcare programs include federal prison hospitals, Indian Health Services, Federal Employees' Compensation Act, Workers' Compensation Programs, Railroad Retirement Board, and Veterans Administration. Together, these programs described herein, as well as all other government-funded healthcare programs, will be referred to as "government healthcare programs".

**E.     The Anti-Kickback Statute and Stark Law**

43.     The Anti-Kickback Statute prohibits the knowing and willful payment of remuneration in cash or in kind to induce or reward patient referrals or the generation of business involving any item or service payable by federal healthcare programs, including Medicaid, Medicare, Tricare/Champus, and other government healthcare programs. 42 USC § 1320a–7b. The AKS prohibits both the offer or payment of kickbacks – by those who offer or pay remuneration – and the solicitation or receipt of kickbacks – by those who solicit or receive remuneration. Compliance with the AKS is a condition of payment by government healthcare programs.

44.     In pertinent part, the AKS provides:

(b)     Illegal remunerations

- 14 -

Case 1:17-cv-01269-JEJ   Document 57   Filed 08/21/18   Page 17 of 37

(1)     Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

> (A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2)     Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

> (A)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B)     to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

* * *

(g)     Kickbacks.  In addition to the penalties provided for in this section or section 1128A [42 USCS § 1320a-7a], *a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code [the FCA].*

42 U.S.C. § 1320a-7b, emphasis added.  Violation of the AKS can also subject the perpetrator to exclusion from participation in federal government healthcare programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid.  42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

45.     The Anti-Kickback Act Statute is designed to, *inter alia*; ensure that patient care will not be improperly influenced by inappropriate compensation from the healthcare industry. Each of the federally-funded government healthcare programs requires every provider who seeks payment from the program to promise and ensure compliance with the provisions of the Anti-Kickback Act and other federal laws governing the provision of healthcare services in the United States. Any claim that includes services resulting from a violation of the AKS, such as services by the physicians to whom the Defendants offered or paid kickbacks, or services by Defendants provided to patients referred to the Hospitals by the physicians who received or solicited kickbacks, are false claims and other unlawful acts under the FCA, TMFPA, and LFCA.

46.     Payment of remuneration of any kind violates the AKS if one or any purpose for that remuneration was to induce referrals. Moreover, payments to physicians in return for the physicians' promises to send patients to a particular facility qualify as kickbacks, as do payments made to induce physicians to send patients to particular facilities. Giving a person the opportunity to earn money may also constitute an inducement under the Anti-Kickback Statute.

47.     The Anti-Kickback Statute provides certain "safe harbors" to exclude specified conduct from its ambit, as long as the involved parties have strictly complied with all the conditions of the safe harbor. However, parties to an arrangement cannot obtain safe harbor protection by entering into a sham contract that complies with the written agreement requirement of a safe harbor and appears, on paper, to meet all of the other safe harbor requirements, but does not reflect the actual arrangement between the parties.

48.     There is a safe harbor for personal service arrangements which requires, among other things, that:

> The aggregate compensation paid to the agent over the term of the agreement is
> set in advance, is consistent with fair market value in arms-length transactions and

is not determined in a manner that takes into account the volume or value of any referrals or business between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs; and

. . .

The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d) (5), (7).

49.     The personal service arrangements and other financial agreements between the Defendants and the physicians whom Defendants paid remuneration are not protected by a safe harbor, where, as Relator learned, the physicians were paid for work that was not performed, was not requested, was not called for under any valid, written agreement, and where, therefore, the payments were not consistent with fair market value.

**F.     The Physician Self-Referral Law (also known as the Stark Law)**

50.     The Stark Law prohibits physicians from referring patients to receive "designated health services" payable by Medicaid, Medicare, Tricare/Champus, or other government healthcare programs from entities with which the physician or an immediate family member has a financial relationship, unless an exception applies. 42 C.F.R. § 411.353.  The Stark Law prohibits physicians from making referrals and prohibits the entities from submitting or causing the submission, of claims in violation of the Stark Law's restrictions on referrals.  Compliance with the Stark Law is a condition of payment by federal healthcare programs.

51.     Enacted as amendments to the Social Security Act, the Stark Law prohibits an entity providing healthcare items or services from submitting claims for payment by government healthcare programs based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the referring entity.

- 17 -

52.     The regulations implementing the Stark Law expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

53.     Congress enacted the Stark Law in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

54.     In 1993, Congress extended the Stark Law (Stark II) to referrals for ten additional designated health services (DHS) effective January 1, 1995, including (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment, and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. 42 U.S.C. § 1395nn(h)(6).

55.     The Stark Law provides, in relevant part:

(a)     Prohibition of certain referrals

     (1)     In general

          Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then –

          (A)     the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

          (B)     the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party

> payor, or other entity for designated health services
> furnished pursuant to a referral prohibited under
> subparagraph (A).

42 U.S.C. § 1395nn.

56.     The Stark Law defines "referral" as "the request or establishment of a plan of care

by a physician which includes the provision of designated health services." 42 U.S.C. §

1395nn(h)(5)(A).  Federal regulations implementing the statute also define "referral" as, among

other things, "a request by a physician that includes the provision of any designated health

service for which payment may be made under Medicare...." 42 C.F.R § 411.351.  A referring

physician is defined as "a physician who makes a referral as defined in this section or who

directs another person or entity to make a referral or who controls referrals made to another

person or entity." *Id.*

57.     The Stark Law expressly prohibits any entity from presenting or causing the

presenting of any claim resulting from a referral from a physician who has a financial

relationship with the entity, unless that relationship fits into one of the specific exceptions in the

law, none of which are applicable to the allegations in this case.

## VI.
## FACTUAL ALLEGATIONS

58.     Relator began working for Defendants in May 2011 as the Chief Executive

Officer and Administrator ("CEO") of Defendants' Northshore Specialty Hospital in Covington,

Louisiana, and he was later transferred to Defendants' Warm Springs Specialty Hospital in

Luling, Texas.  As CEO, Relator was responsible for the business development and operational

performance of these two Long Term Acute Care ("LTAC") facilities.  One of Relator's job

duties for Defendants was to sign off on physician timesheets to certify that the work described

- 19 -

on the timesheets was in fact done, and was within the scope and confines of the contract, before the physician was paid.

59.    Relator discovered, during the course of his employment with Defendants, that physicians were submitting fraudulent timesheets for his approval and payment by Defendants. In order to be paid, each physician must turn in a monthly timesheet that specifies the date, type of work performed, and the amount of time spent performing the work. Relator discovered that physicians were providing timesheets with a large number of hours allegedly worked without specifying what services were provided. Relator's information indicates that these practices occurred at each of Defendants' Hospitals and were not isolated, but were part of a kickback scheme throughout Defendants' Hospitals to induce referrals by physicians practicing in the area of each Defendants' Hospital, in order to generate additional billings from government healthcare programs and other payers. Relator learned that physicians made referrals to Defendants' Hospitals in violation of the AKS, and that Defendants' Hospitals filed claims with government healthcare programs that were false as a result of such AKS violations.

60.    Each physician working at Defendants' Hospitals who was to be compensated by one of the Hospitals was required to sign a Consultant Services Agreement ("CSA") with Defendants, stipulating the specific services each physician was to provide the Hospital, the hourly rate at which the physician is to be compensated for that work, and requiring that they submit timesheets that provide detailed documentation of the duties performed and hours worked relative to the contract.

61.    On March 27, 2012, Relator received the February 2012 timesheet from Hays Pulmonary and Sleep Association ("Hays Pulmonary") showing 57.5 hours of work at a rate of $175 per hour for a total of $10,062.50. Based on the high hourly rate, Relator knew that this

timesheet was for work allegedly performed under Hays Pulmonary's CSA with Defendants. Relator reviewed Hays Pulmonary's CSA and discovered that the CSA stated that Hays Pulmonary was to provide "consultative services relative to budgets, strategic plans, clinical protocols, quality and equipment, at the Administrator's request." As the Administrator, Relator knew that he had not requested any services from Hays Pulmonary and no such services were being provided.

62.     During his review of Hays Pulmonary's CSA, Relator also learned that the Hays Pulmonary CSA dated back to 2008, but was revised in January 2011 to allow the physicians to increase their billable hours from ten (10) hours per month to thirty (30) hours per week. With this twelve-fold increase in allowable billable hours, there was no corresponding change in duties for Hays Pulmonary. Moreover, he knew that he neither required nor requested any consultative services from Hays Pulmonary. It was apparent to Relator that Defendants had dramatically revised the CSA with Hays Pulmonary in order to encourage and remunerate Hays Pulmonary to refer patients to Warm Springs Specialty Hospital of Luling. This revision was made by or with the knowledge of the Parent Defendant, and was not specific to Warm Springs Specialty Hospital of Luling. In fact, he found a note from Scott Butcher, the former CEO of the Hospital stating, "Ventilation is the cash cow . . . easiest way to make a quick buck." LTACs like this Hospital receive the highest margins of profit from patients who are admitted for ventilator weaning; not much care is needed, so these are low-cost patients compared to other types of patients who generally populate LTACs. In short, Relator realized that the Hays Pulmonary CSA was designed to carry out a fraudulent scheme to compensate this physician group to admit their patients to this Hospital.

63.     After learning about this situation, later in the day on March 27, 2012, Relator sent an email to Rick Marek, his supervisor and Vice President and Regional Director of Operations for Defendants, informing him that "There are virtually no notes or justification entered into the comments section.... I am not comfortable signing these timesheets going forward." Relator also informed Mr. Marek that he had reviewed eight (8) months of Hays Pulmonary's timesheets, that there were daily entries in their timesheets for three (3) hours of work. He also explained that since there had been no ventilator patients in the Hospital since November 2011, he had rarely seen any of the Hays Pulmonary physicians, much less talked to them about any consultative services. He told Mr. Marek that no work had been done at his request, to his knowledge the work listed on the timesheets had not been performed, and as a result, he would not be comfortable signing the timesheets.  Mr. Marek told Relator that he needed to contact Dr. Rajesh Shetty with Hays Pulmonary and tell him that Defendants needed more details on their timesheets.  Relator knew that this would not change the legitimacy of the timesheets, because he knew that the work had neither been requested nor performed.

64.     On April 17, 2012, Relator's attorney sent a letter to Defendants' legal counsel informing them of Relator's legal claims and rights related to his refusal to engage in illegal conduct pursuant to the *Sabine Pilot* doctrine of Texas law.

65.     On April 18, 2012, Relator was contacted by Heather N. Eickhoff, Senior Vice President of Human Resources, regarding the April 17, 2012 letter.  Ms. Eickhoff asked Relator to describe the illegal activity that he was refusing to engage in, and Relator explained that he was refusing to sign the timesheets submitted by Hays Pulmonary because they were fraudulent. Relator was assured by Ms. Eickhoff that he would not be subject to any form of retaliation from the company for reporting a "compliance issue."

66.     On April 26, 2012, Relator received the March 2012 timesheet from Hays Pulmonary.  These timesheets provided that services were allegedly provided for "Pt. Consults" and "Planning for Patient Care" for each three (3) hour submission.  Relator knew that he had not requested these services; that these were not duties listed in Hays Pulmonary's CSA, and therefore they were not compensable under the CSA.  He forwarded copies to Mr. Marek and Ms. Eickhoff.  As he reviewed records Relator discovered years of payments from Defendants to Hays Pulmonary for services allegedly performed pursuant to the CSA.

67.     On May 4, 2012, Relator received the April 2012 timesheet for Dr. Rajaram Bala, a plastic surgeon who had a CSA with Defendants.  Relator knew that Dr. Bala came to Warm Springs Specialty Hospital every Thursday, working in the Hospital's wound care center where he saw inpatients from the nursing unit and outpatients who were not admitted to the Hospital, and then went next door to Seton Hospital to do surgery.  Dr. Bala was being provided staff, scheduling services, office, and clinic space by Defendants, all without charge to Dr. Bala, and not at fair market value.  His timesheet showed eight hours of consultation work performed at Warm Springs Specialty Hospital every Thursday, including three hours of staff and physician education and three hours of administrative meetings and shareholder contacts.  Relator knew this was not accurate; Dr. Bala did not spend eight hours at the Hospital on Thursdays, and when he was there, he was seeing patients and billing for their care.

68.     As he had done with Hays Pulmonary, Relator reviewed Dr. Bala's CSA, knowing that Dr. Bala had neither been requested to nor performed any consultation work for Defendants.  He determined that the CSA was virtually identical to Hays Pulmonary's CSA.  Relator concluded there were three major problems with Dr. Bala's CSA.  First, it was a CSA for services that no LTAC would ever need from a plastic surgeon.  Secondly, it did not address the

fact that Dr. Bala was conducting a private clinic in the hospital for his patients, yet he was not being charged for anything. Lastly, Dr. Bala's CSA was structured to provide for an inordinate number of hours per week for consultative services "as requested by the Facility Administrator," which Relator (as the Administrator) knew were neither requested nor provided.

69.     Having reviewed the Hays Pulmonary CSA and Dr. Bala CSA, Relator was certain that the timesheets that had been submitted were clearly fraudulent. He also became convinced that the CSAs were drafted and handled in violation of the Anti-Kickback Statute and Stark Law.

70.     On April 29, Relator filed a comprehensive written complaint with HHS OIG about these payments by Defendants to induce referrals from Hays Pulmonary.

71.     On May 7, 2012, Dr. Shetty confronted Relator about Hays Pulmonary not being paid for February and March 2012. Dr. Shetty informed Relator that the previous Administrator of Warm Springs Specialty Hospital of Luling, Jason Carter, had told him to put down three hours under "Planning and Strategy" on the timesheets to cover Hays Pulmonary's lost hours of productivity in their clinic for the round trip from Kyle to Luling. Dr. Shetty also told Relator that the value that his group brings to the table is referrals and continuity of care. Relator reminded Dr. Shetty that Defendants legally cannot contract with any doctor to bring referrals to Defendants' hospitals. Relator sent an email to Mr. Marek and Ms. Eickhoff informing them of his visit with Dr. Shetty.

72.

73.

74.    The Warm Springs Specialty Hospital of New Braunfels (formerly known as Hill Country Specialty Hospital) was purchased by the Parent Defendant effective October 1, 2011. Immediately the pressure increased to keep both the New Braunfels and the Luling locations full of patients.

75.    A "Hospitalist" is a physician hired as an "in-house" physician at a hospital.  In a typical short-term acute care hospital a Hospitalist improves care by specializing in acute episodes, and by freeing primary care physicians to focus on their patients in clinic.  Hospitalists also act as a selling point for hospitals to primary care physicians, as a convenience for primary care physicians with patients requiring hospital admission.

76.    The Defendants aggressively sought out Hospitalists in their regions with the largest census at their respective hospitals and then contracted with them at lucrative rates in a *quid pro quo* to refer their patients requiring long-term acute care to the Post Acute Medical facilities.

77.    The Warm Springs Specialty Hospital of New Braunfels contracted with Guido Jose Calderon, M.D., the Hospitalist for Central Texas Medical Center San Marcos, and Fransisco Hernandez, Jr., M.D., the Hospitalist for Christus Santa Rosa Hospital – New Braunfels, to be "Hospitalists" for Warm Springs Specialty Hospital of New Braunfels.

78.    The Northshore Specialty Hospital in Covington Louisiana operates under a slightly different business model in that certain physician members of its staff are minority owners of the business itself.  The essential scheme is the same:  physicians employed as Hospitalists or with practices that generate large numbers of patients needing long-term acute care are contracted as "Directors" for Northshore Specialty Hospital.  Relator was transferred from Northshore Specialty Hospital in October of 2011.  At that time the ownership breakdown was as follows:  John Simon, M.D. owned 23%, David Tran, M.D. owned 5%, Craig Parker, M.D. owned 5%, Craig Seicshnaydre, M.D. owned 3%, and Shaun Carpenter, M.D. owned 2%.

79.    Each of the physician-owners was chosen for their relationships in the area.  Both Dr. Tran and Dr. Parker were internists on staff at Lakeview Regional Medical Center.  Dr. Carpenter is a wound care specialist who worked all over the area.  Dr. Seicshnaydre is a Hospitalist at St. Tammany Parish Hospital.  Each of these physicians was in positions to generate significant referrals to Northshore Specialty Hospital.

80.    Three of the physician owners also hold directorship contracts.  John Simon, M.D. is paid $13,000 a month to be the Medical Director and Director of Pulmonology and Director of Critical Care.  Craig Seicshnaydre, M.D. is paid $4,000 a month to be a Hospitalist, and Shaun Carpenter, M.D. is paid $10,416 a month to be the Director of Wound Care.

81.    In addition to the above named doctors, Northshore Specialty Hospital contracted with non-owner physicians as Medical Directors who received fixed stipends.  These included

Camille Bitar, M.D. who is paid $3,000 a month to be the Director of Infectious Diseases and practices at Lakeview Regional Medical Center, Ochsner Medical Center-Northshore, and Slidell Memorial Hospital.   In addition, the following doctors are all paid stipends as Directors of Internal Medicine:

> Joseph Landers, M.D., $1,500 a month (employed as a Hospitalist at St. Tammany Parish Hospital)

> Christopher Darcey, M.D., $1,500 a month (employed as a Hospitalist at St. Tammany Parish Hospital)

> K. Lance Caulfield, M.D., $2,000 a month (practiced at North Oaks Medical Center)

> Leonard Treanor, M.D., $1,500 a month (employed as a Hospitalist at SMH)

Each of these doctors is employed in a hospital within the region and thus in a position to refer many patients to long-term care facilities.

82.    Dr. Simon applied overt pressure to all of physicians contracted with Northshore Specialty Hospital, even going so far as to be heard to say "we are paying you to follow patients over here [Northshore Specialty Hospital], so you need to get with the program and get us some patients over here."

83.    By providing remuneration such as Relator discovered, Defendants sought to increase (1) the Hospitals' patient census, through referrals; (2) the Hospitals' Case Mix Index, which yields higher payments from government healthcare providers such as Medicare; and (3) outpatient revenues from rent-free clinics, as the Hospitals were able to bill the technical component of the services provided there, such as labs, x-rays, and the like.  These payments to physicians by Defendants violate the AKS and Stark Law, and accordingly, payments made by government healthcare providers to Defendants' Hospitals violate the FCA, TMFPA, and LFCA. Relator's complaints about these practices were made in an attempt to stop the violations of the

FCA and TMFPA, his refusal to participate in these practices was a refusal to participate in illegal activities, and was protected under the *Sabine Pilot* doctrine of Texas law.

84.     On May 23, 2012, five days after the call with Defendants' attorney, Mr. Marek and Wayne Finley, Defendants' Corporate HR Director, came to Relator's office at approximately 3:15 p.m. and informed him that he was being placed on administrative leave through May 25, 2012. Later that same day, Relator's attorney received an email from one of Defendants' attorneys stating that "Mr. Johnson is separated from his employment with Post Acute, effective immediately." Subsequently, Relator received a termination letter from Ms. Eickhoff stating that Relator's employment ended on May 25, 2012, but it did not state any alleged basis for Relator's termination.

85.     During Relator's employment with Defendants, and prior to his termination, he had never been disciplined for any reason. He did not receive any verbal or written reprimand, write-up, probation, or suspension during his employment with Defendants. Furthermore, Relator had never been informed by anyone that his work was substandard or insufficient in any way. To the contrary, he had regularly received praise for the work he did at both Northshore Specialty Hospital and Warm Springs Specialty Hospital. Given his history with Defendants and the timing of his expressing his concerns to Defendants about the fraudulent nature of the CSAs at issue, the response from Defendants' attorney, and his termination, it is clear that his termination was in retaliation for his lawful acts in furtherance of this action, other actions to stop violations of the FCA, TMFPA, and LFCA, and/or his refusal to participate in Defendants' illegal conduct by signing the timesheets at issue.

## VII.
## VIOLATIONS OF THE FCA, TMFPA, AND LFCA

86.     Defendants violated the FCA in the following respects:

**a.**     knowingly presented, or caused to be presented, false or fraudulent claims

for payment or approval by government healthcare programs, in violation of Section

3729(a)(1)(A) of the FCA; and

**b.**     knowingly made, used, or caused to be made or used, false records or

statements material to false or fraudulent claims to government healthcare programs, in

violation of Section 3729(a)(1)(B) of the FCA;

87.     Defendants violated the TMFPA in the following respects:

**a.**     knowingly made or caused to be made false statements or

misrepresentations of material facts to permit a person to receive a benefit or payment

under the Medicaid program that is not authorized or that is greater than the benefit or

payment that is authorized, in violation of §36.002(1);

**b.**     knowingly concealed or failed to disclose information that permits a

person to receive a benefit or payment under the Medicaid program that is not authorized

or that is greater than the benefit or payment that is authorized, in violation of

§36.002(2); and

**c.**     except as authorized under the Medicaid program, knowingly paid,

charged, solicited, accepted, or received, in addition to amounts paid under the Medicaid

program, gifts, money, donations, or other consideration as conditions to the provision of

services or products or the continued provision of services or products if the cost of the

services or products is paid for, in whole or in part, under the Medicaid program, in

violation of §36.002(5).

88.     Defendants violated the LFCA by knowingly soliciting, receiving, offering, or

paying any remuneration, including but not limited to kickbacks, bribes, rebates, or bed hold

payments, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a healthcare provider for the furnishing or arranging to furnish any good, supply, or service for which payment may be made, in whole or in part, under the Louisiana medical assistance program, in violation of §438.2 of the LFCA.

## VIII.
## RETALIATION AND WRONGFUL DISCHARGE

89.     Defendants violated the anti-retaliation provision of the FCA, §3730(h), by discharging and in other manners discriminating against Relator in the terms and conditions of his employment because of the lawful acts, described herein, undertaken by Relator in furtherance of an action under the FCA and/or other efforts by Relator, described herein, to stop one or more violations of the FCA.

90.     Defendants violated the anti-retaliation provision of the TMFPA, §36.115, by discharging and in other manners discriminating against Relator in the terms of employment because of lawful acts, including investigation for, initiation of or assistance in this action, as further described herein, by Relator in furtherance of this action under the TMFPA.

91.     In addition, or in the alternative, Defendants terminated Relator's employment for the reason that Relator refused to commit illegal acts under Texas and federal law. Thus, Defendants' actions constitute an illegal termination pursuant to the *Sabine Pilot* doctrine of Texas law.

## IX.
## CONCLUSION

92.     Based upon his experience with Defendants, Relator has evidence that Defendants were engaged in the submission of false claims, fraudulent billing and other wrongful acts with respect to the Medicaid, Medicare, Tricare/Champus and other government healthcare programs.

Based upon his estimation, these practices resulted in millions of dollars in improper taxpayer-funded payments provided to Defendants from the Medicaid, Medicare, Tricare/Champus and other government healthcare programs.  Accordingly, Relator has filed this lawsuit to recover for these violations on behalf of the government and himself, as provided in the FCA, TMFPA, and the LFCA.

93.   In addition, because of his knowledge of these violations of the FCA, TMFPA, and LFCA, and because he took lawful acts in furtherance of an action under the FCA, TMFPA, and LFCA, Defendants terminated and otherwise discriminated against Relator, in violation of the anti-retaliation provisions of the FCA and TMFPA and/or in violation of the *Sabine Pilot* doctrine of Texas law.  Accordingly, Relator seeks to be reinstated by Defendants with the same seniority he would have had but for the discrimination and/or to be compensated with not less than two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees as provided by the FCA, TMFPA, and/or the *Sabine Pilot* doctrine of Texas law.

## X.
## RELIEF REQUESTED

94.   Relator requests the following relief be imposed against Defendants:

a.   That the United States be awarded three times the amount of damages which it sustained because of the acts of Defendants pursuant to 31 U.S.C. §3729(a)(1)(A) and (B) of the FCA; and that Texas be awarded three times the amount of any payment provided under the Medicaid program as a result of Defendants' unlawful acts, pursuant to §36.052(a)(1), (2) and (5) of the TMFPA; and that Louisiana be awarded

the amount of any payment provided under the Medicaid program as a result of Defendants' unlawful acts, pursuant to §438.6A(1) of the LFCA.

  **b.**  That Defendants be held liable for civil penalties of up to $11,000.00, but not less than $5,500.00 (as adjusted pursuant to 31 U.S.C. §3729(a)(1) of the FCA), to the U.S. for each and every act in violation of the FCA; and that Defendants be held liable for civil penalties of up to $15,000.00, but not less than $5,000.00 to the State of Texas for each and every unlawful act in violation of the TMFPA, pursuant to §§36.052(a)(3) and 36.052(b) of the TMFPA; and that Defendants be held liable for civil fines of up to $10,000 per violation, or an amount equal to three times the value of the illegal remunerations, whichever is greater, pursuant to §438.6B(1) of the LFCA; and that Defendants be held liable for civil monetary penalties of not less than $5,000.00 but not more than $10,000.00 pursuant to§438.6C(1)(a) of the LFCA.

  **c.**  That this Court award such interest as is available pursuant to the FCA, the TMFPA, and/or the LFCA;

  **d.**  That in the event the United States intervenes in this action and takes over its prosecution, the Relator be awarded an amount for bringing this action for the United States of at least 15% but not more than 25% of the proceeds paid to the United States resulting from the trial or settlement of the claim, pursuant to 31 U.S.C. §3730(d)(1) of the FCA; and that in the event the State of Texas intervenes in this action and takes over its prosecution, the Relator be awarded an amount for bringing this action for the State of Texas of at least 15% but not more than 25% of the proceeds paid to the State of Texas resulting from the trial or settlement of the claim, pursuant to §36.110(a) of the TMFPA; and that in the event the State of Louisiana intervenes in this action and takes over its

prosecution, the Relator be awarded an amount for bringing this action for the State of Louisiana of at least 15% but not more than 25% of the proceeds paid to the State of Louisiana resulting from the trial or settlement of the claim, pursuant to §439.4A(1) of the LFCA.

      **e.**      That in the event the United States does not intervene in this action, the Relator be awarded an amount for collecting the civil penalties and damages for the United States of at least 25% but not more than 30% of the proceeds paid to the United States resulting from the trial or settlement of the claim, pursuant to 31 U.S.C. §3730(d)(2) of the FCA; and that in the event the State of Texas does not intervene in this action, the Relator be awarded an amount for collecting the civil penalties and damages for the State of Texas of at least 25% but not more than 30% of the proceeds paid to the State of Texas resulting from the trial or settlement of the claim, pursuant to §36.110(a-1)of the TMFPA; and  that in the event the State of Louisiana does not intervene in this action, the Relator be awarded an amount for collecting the civil penalties and damages for the State of Louisiana of at least 25% but not more than 30% of the proceeds paid to the State of Louisiana resulting from the trial or settlement of the claim, pursuant to §439.4B of the LFCA.

      **f.**      That this Court award reasonable attorneys' fees, costs and expenses to Relator, which were necessarily incurred in bringing and prosecuting this case, pursuant to 31 U.S.C. §3730(d)(1) or (2) of the FCA, §36.110(c) of the TMFPA, and §439.4C(1) of the LFCA.

      **g.**      That this Court order that Defendants reinstate Relator as Chief Executive Officer with the same seniority he would have had but for the retaliation, and that the

Court award compensation to Relator for Defendants' retaliation of not less than two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, as provided by 31 U.S.C. §3730(h) of the FCA, §36.115 of the TMFPA; and the *Sabine Pilot* doctrine of Texas law.

**h.**     That this Court award Plaintiff such other relief as it deems just, necessary and fair.

**XI.**
**JURY DEMAND**

95.     Relator requests a trial by jury of all issues so triable.

Respectfully submitted,

Patrick J. O'Connell
Texas Bar No. 15179900
Jan Soifer
Texas Bar No. 18824530
Maya Guerra Gamble
Texas Bar No. 24000194
O'CONNELL & SOIFER LLP
98 San Jacinto Blvd., Ste. 540
Austin, Texas  78701
(512) 222-0444 (phone)
(512) 222-0422 (fax)
jsoifer@oconnellsoifer.com
poconnell@oconnellsoifer.com
mgamble@oconnellsoifer.com

Derek Howard
Texas Bar No. 10064600
Logan Howard
Texas Bar No. 24069952
Howard & Kobelan
100 Congress Avenue, Suite 1720
Austin, Texas  78701
(512) 480-9300 (phone)
(512) 480-9374 (fax)
dhoward@howardkobelan.com
lhoward@howardkobelan.com

**ATTORNEYS FOR RELATOR**
**DOUGLAS L. JOHNSON**